**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

REAL ALTERNATIVES, INC.;  :  1:15-cv-0105
KEVIN I. BAGATTA, ESQ.;   :
THOMAS A. LANG, ESQ.;   :
CLIFFORD W. MCKEOWN, ESQ. :
           :
   Plaintiffs,    :  Hon. John E. Jones III
           :
  v.        :
           :
SYLVIA M. BURWELL, in her official :
capacity as Secretary of the Department :
of Health and Human Services, *et al.*, :
           :
   Defendants.   :

## MEMORANDUM

### December 10, 2015

Presently before the Court are the Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment, and the Plaintiffs' Motion for Summary Judgment. Docs. 27, 29. For the reasons that follow, the Court will deny the Plaintiffs' motion in its entirety and grant Defendants' motion for Summary Judgment.

## I. FACTUAL BACKGROUND

### A. The Affordable Care Act

In March 2010, the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) and the Health Care and Education Reconciliation

Act, Pub. L. No. 111-152, 124 Stat. 1029 (2010) (collectively, the "ACA") passed into law.  The ACA requires non-grandfathered group health care plans[1] and insurance providers offering non-grandfathered coverage to supply four categories of recommended preventive health services, without requiring copayments or deductibles from plan participants and beneficiaries.  Doc. 1, ¶¶ 49-53; *see* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 76 Fed. Reg. 46,621, 46,622-23 (Aug. 3, 2011).  The four categories of preventive health services include: (1) items or services that have an "A" or "B" rating from the United States Preventive Services Task Force; (2) immunizations as recommended by the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention; (3) preventive care and screenings for infants, children and adolescents as provided for by the guidelines supported by the Health Resources and Services Administration ("HRSA");[2] and (4) preventive care and screenings for women, also as provided by guidelines supported by the HRSA.  76 Fed. Reg. 46,622-23 (Aug. 3, 2011).

---

[1]  Grandfathered heath plan coverage is that which has existed continually prior to March 23, 2010, and has not undergone any of several specified changes since that time.  29 C.F.R. § 2590.715-1251 (2010).

[2]  The HRSA is a component of the Department of Health and Human Services ("HHS").

At the time that the ACA passed into law, no guidelines regarding preventive care and screenings for women existed.  Doc. 27, p. 4.  Thus, the HHS requested recommended guidelines from the Institute of Medicine ("IOM"), a nonprofit organization established by the National Academy of Sciences and funded by Congress.[3]  Doc. 1, ¶ 56; Doc. 27, p. 4.  In response to this request, the IOM recommended that the HRSA adopt guidelines endorsing, among other measures, breastfeeding support, domestic violence screening, and also "the full range of [FDA]-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity."  Doc. 27, p. 5.  FDA-approved contraceptive methods include diaphragms, oral contraceptives, intrauterine devices, and emergency contraceptives (such as "Plan B," also known as the "morning-after pill," and ulipristal, also known as "Ella" or the "week-after pill").  *Id*.[4]  The IOM asserts that the services recommended by its proposed guidelines are "shown to improve well-being, and/or decrease the likelihood or delay the onset of a targeted disease or condition."  *Id*. at 4-5.

---

[3] The IOM's purpose is to provide expert advice to the government on matters of public health.  Doc. 27, p. 4.

[4] Referencing INST. OF MED., CLINICAL PREVENTIVE SERVICES FOR WOMEN: CLOSING THE GAPS, *available at* http://iom.nationalacademies.org/reports/2011/clinical-preventive-services-for-women-closing-the-gaps.aspx (hereinafter "IOM REPORT").  As discussed in greater detail further below, Plaintiffs believe that these contraceptive devices may cause abortions. Doc. 1, ¶¶ 1, 26.

On August 1, 2011, the HRSA adopted the IOM's recommended guidelines regarding preventive care and screenings for women in full. Doc. 1, ¶ 66. In doing so, the HRSA required every non-exempt employer to provide these services for their employees in their health insurance coverage plans (the "Contraceptive Mandate"). *Id.* On the same day, an exemption from the Contraceptive Mandate for certain religious employers was proposed as an interim final regulation. Doc. 1, ¶¶ 71-72. The Departments of Treasury, Labor, and the HHS (collectively, the "Departments") explained that certain commenters to the proposed guidelines had suggested that requiring religious employers to sponsor group health plans for their employees that provide contraceptive services could impinge upon those employers' religious freedom. 76 Fed. Reg. 46,621, 46,624 (Aug. 3, 2011). In light of these comments, the Departments determined that:

> it is appropriate that HRSA, in issuing these Guidelines, takes into account the effect on the religious beliefs of certain religious employers if coverage of contraceptive services were required in the group health plans in which employees in certain religious positions participate. Specifically, the Departments seek to provide for a religious accommodation that respects the unique relationship between a house of worship and its employees in ministerial positions. Such an accommodation would be consistent with the policies of States that require contraceptive services coverage, the majority of which simultaneously provide for a religious accommodation.

*Id.*

To qualify for the religious employer exemption as it was set forth in the

2011 regulations, an employer was required meet criteria consistent with the exemptions adopted in most states.  A religious employer was required to: (1) have as its purpose the inculcation of religious values; (2) primarily employ persons who share its religious tenets; (3) primarily serve persons who share its religious tenets; and (4) be a non-profit organization under Section 6033(a)(1) and Section 6033(a)(3)(A)(i) or (iii) of the Code.[5]  *Id.*

Though the religious employer exemption went into effect immediately,[6] the Departments requested comments on this definition, as well as alternative definition submissions.  *Id.*  The Departments also noted that "[b]ecause the HRSA's discretion to establish an exemption applies only to group health plans sponsored by certain religious employers and group health insurance offered in connection with such plans, health insurance issuers in the individual health insurance market would not be covered under any such exemption."  *Id.* at 46,623-24.

---

[5]  These provisions refer to "churches, their integrated auxiliaries, conventions or associations of churches, and the exclusively religious activities of any religious order."  26 U.S.C. §§ 6033(a)(3)(A)(i) and (iii).

[6]  "Under the Administrative Procedure Act (APA), while a general notice of proposed rule making and an opportunity for public comment is generally required before promulgation of regulations, an exception is made when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest.  The provisions of the APA that ordinarily require a notice of proposed rulemaking do not apply here because of the specific authority to issue interim final rules granted by Section 9833 of the Code, Section 734 of ERISA and Section 2792 of the PHS Act."  76 Fed. Reg. 46,621, 46,624 (Aug. 3, 2011).

In February 2012, the Departments formally adopted the exemption set forth in the 2011 interim final regulations.[7]   77 Fed. Reg. 8,725 (Feb. 15, 2012).  The Departments also provided a "temporary enforcement safe harbor," a one-year period of non-enforcement for non-exempted, non-profit organizations with religious objections to providing coverage for contraceptive services, and whose group health plans were not grandfathered.  *Id*.  During the safe harbor period, the Departments announced that they would "plan to develop and propose changes to these final regulations that would meet two goals – providing contraceptive coverage without cost-sharing to individuals who would want it and accommodating non-exempted, non-profit organizations' religious objections to covering contraceptive services . . . ."  *Id*.

In August 2013, the final rules regarding the religious employer exemption went into effect.  78 Fed. Reg. 39,874 (July 2, 2013).  The new rules significantly shortened the definition of an exempt religious employer and expanded it to ensure that "an otherwise exempt plan is not disqualified because the employer's purposes

---

[7]  In the interim period, over 200,000 comments were received, expressing a gamut of opinions on the exemption.  77 Fed. Reg. 8,727.  Some commenters felt the exemption was an appropriate compromise for employers of differing religious views and values, and should be maintained.  *Id*.  Others argued that the exemption should be repealed in its entirety and no exception provided for religious employers at all.  Still others urged that the definition be expanded to include additional religiously-minded employers.  *Id*.

extend beyond the inculcation of religious values or because the employer serves or

hires people of different religious faiths." *Id*.  Instead of the four-pronged

definition, the final rules clarified that any "employer that is organized and operates

as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the

[Internal Revenue] Code" is considered a religious employer for purposes of the

religious employer exemption.  *Id*.  The Departments further noted that:

> the simplified and clarified definition of religious employer continues
> to respect the religious interests of houses of worship and their
> integrated auxiliaries in a way that does not undermine the
> governmental interests furthered by the contraceptive coverage
> requirement.  Houses of worship and their integrated auxiliaries that
> object to contraceptive coverage on religious grounds are more likely
> than other employers to employ people of the same faith who share
> the same objection, and who would therefore be less likely than other
> people to use contraceptive services even if such services were
> covered under their plan.

*Id*. at 39,874-75.

Due to this exemption, and others, "the contraceptive mandate presently

does not apply to tens of millions of people."  *Burwell v. Hobby Lobby Stores, Inc.*,

134 S.Ct. 2751, 2764 (2014).  Rather, insurance providers supply contraceptive

coverage to individual employees independently of the plans sponsored by

exempted employers with religious objections to contraceptive care.  Doc. 27, pp.

30-31 (explaining that "the grandfathering provision applies at the *plan* level . . . .

Likewise, the religious employer exemption operates on a plan-wide basis, *see* 45

C.F.R. §147.131(a), and does not permit individual plan participants and

beneficiaries to opt out of contraceptive coverage.").

Since the time that the final rules went into effect, dozens of lawsuits similar

to the one presently before this Court have challenged both the Contraceptive

Mandate and the dimensions of its exemptions. *See Geneva Coll. v. Sebelius*, 929

F.Supp.2d 402, 411 (W.D.Pa. 2013) (similarly commenting on the vast array of

litigation surrounding the Contraceptive Mandate).

### B.    Real Alternatives

Plaintiff Real Alternatives is a non-profit, non-religious, pro-life

organization formed under the laws of the Commonwealth of Pennsylvania.  Doc.

1, ¶ 6.  Real Alternatives does not hold itself out as a religious entity, is not

incorporated as such, and has not adopted any religious views or positions.  *Id*. ¶

17.  Rather, its views are based on "science, reason, and non-religious

philosophical principles."  *Id*. ¶ 18.

Real Alternatives avers that its primary purpose is to provide "life-affirming

alternatives to abortion services throughout the nation."  *Id*. ¶ 16.  It offers

pregnancy and parenting support programs, as well as abstinence education

services, to women and families throughout Pennsylvania, Michigan and Indiana.

*Id*. ¶ 19.  The programs are administered through networks of social service

8

agencies, which Real Alternatives hires as subcontractors.  In all three state programs, Real Alternatives requires its subcontracting organizations to share its views, to contractually agree to promote childbirth rather than abortion, and to refrain from performing abortions and from counseling women to have abortions. *Id*. ¶¶ 22-23.  Real Alternatives also requires its subcontractors to contractually promise not to recommend or provide contraceptives that Real Alternatives believes can destroy human embryos, including all IUDs and hormonal birth control methods.  *Id*. ¶¶ 1, 21, 23.  Real Alternatives perceives these drugs to be morally wrong and alleges that they may cause abortions and potentially inflict negative side effects upon the women who use them.  *Id*. ¶ 24.  Real Alternatives further alleges that, because of its pro-life commitment, it only hires employees who share the company's beliefs concerning abortion and contraceptive drugs.  *Id*. ¶ 33.

Since 2008, Real Alternatives has excluded contraceptive care from its health insurance plan.  *Id*. ¶ 32.  However, the plan to which Real Alternatives subscribed was cancelled by its insurance provider during 2014.  *Id*. ¶ 36.  Real Alternatives alleges that the ACA's Contraceptive Mandate caused its insurer to no longer be willing to omit contraceptive care from coverage.  *Id*.  As a result of the cancellation, Real Alternatives' current health care plan does not qualify for

grandfathered status.  *Id.* ¶ 35.  Real Alternatives alleges that "morally acceptable coverage" would be available for purchase if providing such coverage to Real Alternatives were legally permissible.  Specifically, Real Alternatives believes that the coverage would be available if Real Alternatives received a court order permitting it to obtain such coverage.  *Id.* ¶ 37.  Real Alternatives further asserts that it desires to provide its full-time employees with health insurance in order to maintain a responsible business practice, as an essential employment benefit, and so employees will have a pro-life health insurance option.  *Id.* ¶ 38.

**C.    Plaintiffs Kevin I. Bagatta, Esq., Thomas A. Lang, Esq., and Clifford W. McKeown, Esq.**

Plaintiffs Kevin I. Bagatta, Esq. ("Bagatta"), Thomas A. Lang, Esq. ("Lang"), and Clifford W. McKeown, Esq. ("McKeown") work for Real Alternatives  (collectively the "Real Alternatives Employees").  They are, respectively, the President, Vice President of Operations and the Vice President of Administrations.  *Id.* ¶¶ 7-9.  They are the only full-time employees currently with Real Alternatives, and they aver that they share in the company's beliefs concerning contraceptive drugs.  *Id.* ¶¶ 33-34.  Each employee receives health insurance coverage through Real Alternatives, as do their wives and a total of seven minor children, three of whom are female.  *Id.* ¶ 39.

Bagatta and Lang are both Catholic Christians.  *Id.* ¶ 40.  McKeown is an

10

Evangelical Christian.  *Id.*  All of the Real Alternatives Employees claim moral as well as religious objections to participating in a health insurance plan that provides coverage for services that they believe contradict their religious values.  *Id.* ¶¶ 45-46.  They further believe that "part of God's command to take care of one's health includes maintaining health insurance," *id.* ¶ 47, and therefore forcing the Real Alternatives employees to participate in an objectionable health insurance plan "places numerous substantial burdens on the religious beliefs and exercise of each individual employee."  *Id.* ¶ 48.

## II.    PROCEDURAL HISTORY

Plaintiffs commenced this action with the filing of a Complaint on January 16, 2015, Doc. 1, challenging the constitutionality of the Contraceptive Mandate and the religious employer exemption under the Fifth Amendment, and asserting additional claims under the Administrative Procedure Act and Religious Freedom Restoration Act.

In their first Count, Plaintiffs argue that the religious employer exemption impermissibly treats certain religious organizations that object to complying with the Contraceptive Mandate differently than other similarly situated but non-religious organizations, such as Real Alternatives.  *Id.* ¶¶ 136-40.  This unequal treatment, according to Real Alternatives, "furthers no governmental interest and is

not tailored to advance any governmental interest" and is thus in violation of the Due Process Clause of the Fifth Amendment. *Id.* ¶¶ 142-43. Plaintiffs' second Count alleges that the Contraceptive Mandate is in violation of the Administrative Procedure Act (the "APA"), 5 U.S.C. § 706(2)(A), because it is contrary to existing federal law, including the Weldon Amendment of the Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009, Pub. L. No. 110-329, Dic. A, Sec. 101, 122 Stat. 3574, 3575 (Sept. 30, 2008), the Church Amendment, 42 U.S.C. § 300a-7(d), the Religious Freedom Restoration Act, the ACA itself, and the Fifth Amendment of the United States Constitution. In their third Count, Real Alternatives Employees allege a substantial burden to their religious exercise in violation of Religious Freedom Restoration Act, 42 U.S.C. § 2000bb.

Plaintiffs seek judgment declaring the Contraceptive Mandate and its application to Plaintiffs to be a violation of the Fifth Amendment, the APA and Religious Freedom Restoration Act. Doc. 1, p. 39 ¶ A. They further request a permanent injunction ordering Defendants to offer the religious employer exemption to organizations such as Real Alternatives, namely non-religious, non-profit, pro-life organizations that hire employees who share their beliefs. *Id.* ¶ B. Plaintiffs also request a permanent injunction prohibiting Defendants from

applying the Contraceptive Mandate to Plaintiffs and their insurers in any way that
requires them to maintain coverage for services that contradict their moral and
religious beliefs, or that penalizes them for not offering such coverage. *Id.* ¶ C.
Finally, Plaintiffs also request injunctive relief for other pro-life groups similarly
situated but not before the Court, nominal damages, court costs and reasonable
attorneys' fees, and such other relief as the Court deems necessary. *Id.* ¶¶ D, E.

On May 28, 2015, Defendants submitted the instant Motion to Dismiss or in
the alternative, Motion for Summary Judgment, Doc. 27, along with supportive
filings. Docs. 28, 33, 34. In response, Plaintiffs submitted their own Motion for
Summary Judgment on July 1, 2015. Doc. 29. Supportive filings followed
Plaintiffs' submission as well. Docs. 30, 35, 36. The Court has thus had the
benefit of a full complement of submissions, and the case is ripe for review.

## III.   STANDARDS OF REVIEW

### A.    Motion to Dismiss

A motion to dismiss pursuant to Rule 12(b)(6) contends that the complaint
has failed to assert a claim upon which relief can be granted. *See* FED. R. CIV. P.
12(b)(6). In considering the motion, courts "accept all factual allegations as true,
construe the complaint in the light most favorable to the plaintiff, and determine
whether, under any reasonable reading of the complaint, the plaintiff may be

entitled to relief." *Phillips v. Cnty. Of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)). To resolve the motion, a court generally should consider only the allegations in the complaint, as well as "any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (citation and internal quotation marks omitted).

In general, a Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirements of Rule 8(a).  Rule 8(a)(2) requires that a complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief, "in order to 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (alteration omitted)).  While a complaint attacked by a Rule 12(b)(6) motion to dismiss need not contain detailed factual allegations, it must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  To survive a motion to dismiss, "a civil plaintiff must allege facts that 'raise a right to relief above the speculative level . . . .'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d

14

Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). Accordingly, to satisfy the plausibility standard, the complaint must indicate that the defendant's liability is more than "a sheer possibility." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Under the two-pronged approach articulated in *Twombly* and later formalized in *Iqbal*, a district court must first identify all factual allegations that constitute nothing more than "legal conclusions" or "naked assertion[s]." *Twombly*, 550 U.S. at 564, 557. Such allegations are "not entitled to the assumption of truth" and must be disregarded for purposes of resolving a 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 679. Next, the district court must identify "the 'nub' of the . . . complaint – the well-pleaded, nonconclusory factual allegation[s]." *Id.* at 680. Taking these allegations as true, the district judge must then determine whether the complaint states a plausible claim for relief. *See id.*

However, "a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips*, 515 F.3d at 231 (citing *Twombly*, 550 U.S. at 556-57). Rule 8 "'does not impose a probability requirement at the pleading stage,' but instead

'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Id.* at 234 (quoting *Twombly*, 550 U.S. at 556).

### B.   Motion for Summary Judgment

Also applicable here is the standard of review pertaining to summary judgment motions.  Summary judgment is appropriate if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A dispute is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a fact is "material" only if it might affect the outcome of the action under the governing law.  *See Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 172 (3d Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A court should view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences therefrom, and should not evaluate credibility or weigh the evidence.  *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

Initially, the moving party bears the burden of demonstrating the absence of a genuine dispute of material fact.  *See id.* at 773 (citing *Celotex Corp. v. Catrett*,

477 U.S. 317, 324 (1986)).  Upon satisfaction of that burden, the non-movant must

go beyond the pleadings, pointing to particular facts that evidence a genuine

dispute for trial.  *See id.*  In advancing their positions, the parties must support their

factual assertions by citing to specific parts of the record or by "showing that the

materials cited do not establish the absence or presence of a genuine dispute, or

that an adverse party cannot produce admissible evidence to support the fact."

FED. R. CIV. P. 56(c)(1).

A court should not grant summary judgment when there is a disagreement

about the facts or the proper inferences that a factfinder could draw from them.

*See Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010) (citing *Peterson v. Lehigh*

*Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982)).  Still, "the mere existence of

*some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment."  *Layshock ex rel. Layshock v.*

*Hermitage Sch. Dist.*, 650 F.3d 205, 211 (3d Cir. 2011) (quoting *Anderson*, 477

U.S. at 247-48) (internal quotation marks omitted).

## IV.   DISCUSSION

The questions raised by the parties are matters of law, and they have been

fully briefed.  There are no material factual disputes contained within the

pleadings.  Accordingly, the record is sufficient for a determination on the merits

under the summary judgment standard, or, where reliance on the record is unnecessary, under the motion to dismiss standard.

## A.    Standing

At the outset, Defendants argue that Plaintiff Real Alternatives lacks standing to bring the constitutional claims alleged in the instant suit.  In order to establish standing pursuant to Article III, Real Alternatives must allege an injury that is redressable by a favorable ruling from this Court.  Defendants argue that Real Alternatives has failed to do so because any redressability of its claim is contingent upon the actions of a third party, its insurer.  Without independent proof that the insurer is willing to provide the requested coverage, and thus permit the redressability that Plaintiffs seek, Defendants assert that Real Alternatives lacks standing to sue.  For the reasons enumerated below, we disagree.

In *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), the Supreme Court explained

> [o]ver the years, our cases have established that the irreducible constitutional minimum of standing contains three elements.  First, the plaintiff must have suffered an injury in fact - an invasion of a legally protected interest . . . .  Second, there must be a causal connection between the injury and the conduct complained of . . . .  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."  The party invoking federal jurisdiction bears the burden of establishing these elements.

*Lujan*, 504 U.S. at 560 (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26,

41-42 (1976)).  "At the pleading stage, general factual allegations of injury . . . may suffice," but in response to a motion for summary judgment, a plaintiff must provide "specific facts" that establish standing by affidavit or other evidence, "which for purposes of the summary judgment motion will be taken to be true." *Id.* at 561 (citation omitted).

The specific facts enumerated by Real Alternatives in regards to its alleged injury are as follows: due to the ACA's Contraceptive Mandate, it cannot provide a health insurance plan to its employees that conforms with its beliefs.  As a result, Real Alternatives is forced to pay for a plan that provides coverage for contraceptive care, thereby creating the possibility that some of its funds may be diverted into paying for this care, or else provide no insurance at all.  Real Alternatives neither requests nor receives health insurance from the government.  Rather, it wishes to purchase health coverage that complies with its beliefs from a private insurer.  As noted in the Factual Background, Real Alternatives alleges that a court order enjoining the Contraceptive Mandate would cause an insurer to craft and sell group health coverage that does not provide coverage for contraceptive services.  Therefore, it asserts, a favorable ruling from this Court would indirectly provide Real Alternatives with the redress that it seeks.  Doc. 1, ¶ 37.

When, as argued here, "[t]he existence of one or more of the essential

19

elements of standing 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict,'. . . it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such a manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562 (internal citations omitted).  "When the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but is ordinarily "substantially more difficult to establish."  *Id*.[8]

As evidence of the likelihood of redressability, Plaintiffs point to the specific past practice of Real Alternatives' insurer.  Until 2014, that insurance provider supplied Real Alternatives with a plan that omitted the objected-to services.  Plaintiffs allege that because of the requirements instituted by the ACA,

---

[8] We note that no proof of an insurer's willingness to provide the requested coverage was required by the district court to establish plaintiffs' standing in *Conestoga Wood Specialties Corp. v. Sebelius*, 917 F. Supp. 2d 394 (E.D.Pa. 2013).  The issues presented in *Conestoga Wood* were ultimately decided by the Supreme Court in conjunction with *Burwell v. Hobby Lobby Stores, Inc*.  There, the facts indicate that the plaintiffs had nearly identical standing to Plaintiffs here.  *See Conestoga Wood*, 724 F.3d 377 (3d Cir. 2013); *Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751 (2014).  However, while proof of the plaintiffs' ability obtain insurance was not required, neither was the standing issue specifically addressed.  As Defendants here note, "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925).  Thus, mere exercise of jurisdiction in a similar case without further evidence or analysis is not sufficient to establish that standing exists here either, without additional inquiry.

however, the insurance provider was no longer willing to omit those services from coverage.[9]  Doc. 1 ¶ 36.  Plaintiffs present "uncontested evidence that they specifically and successfully negotiated with their insurer to sell them a morally acceptable plan until the mandate came along, and thus that the insurer would do so again," were this Court to hold the Contraceptive Mandate inapplicable to Plaintiffs.  Doc. 35, p. 4.

In arguing that the Plaintiffs' averment alone, without specific proof supplied by the insurer, is sufficient to establish standing, Plaintiffs point to *Utah v. Evans*, 536 U.S. 452 (2002).  There, the Supreme Court held that the state of Utah had standing to challenge a census counting method that allegedly caused it to lose a Congressional Seat in the House of Representatives.  However, a favorable ruling on the merits would have only caused the Secretary of Commerce to generate a new report of the results of the census, the results of which were at that time unknown.  The ruling would not immediately cause the reassignment of the Congressional Seat.  The Court determined that a favorable ruling would constitute "a change in a legal status . . . and the practical consequence of that change would amount to a significant increase in the likelihood that the plaintiff

---

[9]  It was for this reason that Plaintiffs aver that they were unable to maintain grandfathered coverage.  Doc 1, ¶ 35.

would obtain relief that directly redresses the injury suffered." *Id*. at 464.  This

significant increase caused the Court to find that the Plaintiff, Utah, had established

standing.

Plaintiffs here argue that, as in *Utah*, an injunction preventing the

government from enforcing the contraceptive coverage requirement against Real

Alternatives' insurance provider would result in a change of legal status.  That

change would, according to Plaintiffs, greatly increase the chance that the provider

would supply insurance of the sort that complies with Plaintiffs' beliefs.

Admittedly, the causal link between a favorable ruling and the ultimate

procurement of redressability for Plaintiffs here is more attenuated than that

described in *Utah v. Evans*.[10]  However, given that the provider was willing to

provide the sort of insurance Plaintiffs desire before the Contraceptive Mandate

was enforced, we find Plaintiffs' evidence persuasive.   Furthermore, there are

other insurance  providers in Pennsylvania that already supply similarly acceptable

plans to organizations currently either covered by grandfathered plans or that fall

---

[10]  The Court in *Utah v. Evans* noted that, should the new census report requested by Utah uncover a serious error in the census counting system, "its correction translates mechanically into a new apportionment of Representatives without further need for exercise of policy judgment." *Utah v. Evans*, 536 U.S. at 462.  While no further exercise of policy judgment would be required for Plaintiffs here to purchase a health care plan that conforms with their beliefs, should Plaintiffs' insurance provider be willing to sell them one, that independent decision making process is nonetheless less assured than the "mechanical" process that the Court in *Utah* describes.

within the exemption for houses of worship as described above.  It is therefore
likely that either Real Alternatives' original insurer or another would provide the
same service again were the Contraceptive Mandate determined to be inapplicable
to Real Alternatives.

Defendants call our attention to *Annex Medical, Inc. v. Burwell*, 769 F.3d
578, (8th Cir. 2014), a case with similar facts to those presented here.  There,
plaintiffs were required to supply proof from their insurer that it would be willing
to provide insurance as requested if an injunction were granted.  There, the Eighth
Circuit held that plaintiffs lacked standing due to a failure to provide this proof.
We find the facts in *Annex* distinguishable from those here on two key grounds.
First, the plaintiff's insurer in *Annex* had not been willing to provide plaintiffs with
the desired insurance plan, even before the Contraceptive Mandate required
coverage for contraceptive services.  *Annex*, 769 F.3d at 582.  Regarding whether
the insurer would be willing to do so in the future, the court noted that "[w]hat few
indications appear on the record are to the contrary."  *Id*.  In contrast, Plaintiffs
here have submitted proof of their insurer's past willingness to provide a suitable
group health plan and there are no indications that the insurer would be unwilling
to do so in the future.

We find the second differentiating factor in *Annex* to be that "the pleadings

and record contain[ed] no indication *any* Minnesota health insurer [was] willing, but for the mandate, to sell a plan allowing a small employer such as Annex to prohibit coverage for a handful of healthcare products and services." *Id.* However, here, Plaintiffs allege that "Real Alternatives could have multiple vendors to choose from if it obtained injunctive relief." Doc. 29, p. 14. They point out that the government's own regulations allow insurers to sell coverage that omits contraceptive care to churches in Pennsylvania. *Id.* Thus, were they to attain a favorable ruling from this Court, it is appropriate to conclude that Real Alternatives could purchase a contraceptive-free plan from these providers just like any church.

In another case with facts similar to those of the instant scenario, the same court distinguished its ruling in *Annex* and arrived at a similar conclusion. In *Wieland v. United States Department of Health and Human Services*, 793 F.3d 949, 957 (8th Cir. 2015), the Eighth Circuit held that "it is more than merely speculative that the [plaintiffs'] injury would be redressed if they were granted the injunctive relief they seek . . . . Before the threatened enforcement of the Mandate, the State and [insurer] were willing to offer the [plaintiff] a contraceptive-free healthcare plan, which is persuasive evidence that they would do so again if the [plaintiffs] obtain their requested relief." *Wieland*, 793 F.3d at 957 (overturning

the district court ruling that the plaintiffs lacked standing).

Defendants argue that *Wieland* is inapplicable because it was decided on a motion to dismiss and not under the more strenuous standard of summary judgment. As noted above, in response to a summary judgment motion, Plaintiffs must allege specific facts and not mere conclusory allegations. *See Lujan*, 504 U.S. at 561. We disagree with Defendants and find the specific proof that Plaintiffs submitted verifying that they obtained a policy in accordance with their beliefs prior to the Contraceptive Mandate's enforcement sufficient to satisfy the summary judgment standard. While it is true that evidence that Plaintiffs were able to secure coverage in the past does not conclusively show that Plaintiffs would be able to secure it again in the future, Plaintiffs need not present conclusive evidence. They need only show that it is *likely* that they would be able to obtain the insurance they desire. *Id.* at 560. We conclude that they have met this burden and that Real Alternatives has established standing to bring its constitutional claim.

### B. Substantive Claims

Having established Real Alternatives' standing to sue, we now turn to the substantive arguments of this case. As aforestated, no factual issues exist that would prevent the parties from receiving summary judgment, and we shall now consider their arguments on the merits.

### 1.     Fifth Amendment Equal Protection Claim

Plaintiffs argue that the Contraceptive Mandate violates Real Alternatives'
right to equal protection under the Fifth Amendment.   They assert that the
Mandate's exemption for religious employers makes an impermissible distinction
between employers that object to contraceptives on moral or philosophical
grounds, and employers that object on religious grounds.   The distinction,
Plaintiffs argue, has no rational relationship to a legitimate government interest.
Doc. 1, ¶ 2.  For the following reasons, we disagree.

### a.     Applicable Standard

While the Fifth Amendment contains no express equal protection guarantee,
"the Fifth Amendment's Due Process Clause prohibits the federal government
from engaging in discrimination that is 'so unjustifiable as to be violative of due
process.'"  *Abdul-Akbar v. McKelvie*, 239 F.3d 307, 316 (3d Cir. 2001) (quoting
*Schlesinger v. Ballard*, 419 U.S. 498, 500 n.3 (1975)).  Thus, the Supreme Court
has interpreted the Fifth Amendment to contain a guarantee of equal protection.
*Id.* (citing *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 616 (1991)).

To prevail on an equal protection claim, a plaintiff must show that "the
government has treated it differently from a similarly situated party and that the
government's explanation for the differing treatment 'does not satisfy the relevant

level of scrutiny.'" *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 215 (D.C. Cir. 2013) (quoting *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1102 (D.D.C. 2008)).   "Statutes that substantially burden a fundamental right or target a suspect class must be reviewed under 'strict scrutiny . . . .'" *Abdul-Akbar*, 239 F.3d at 317 (quoting *Plyer v. Doe*, 457 U.S. 202, 216-17 (1982)).   However, if a statute neither burdens a fundamental right nor targets a suspect class, "it does not violate the Fourteenth Amendment's Equal Protection Clause, as incorporated through the Fifth Amendment's Due Process Clause, so long as it bears a rational relationship to some legitimate end." *Id*. (quoting *Romer v. Evans*, 517 U.S. 620, 631 (1996)).

In the instant case, the parties concur that the relevant level of scrutiny is rational basis review.   Real Alternatives avers that it is "not incorporated as a religious entity, does not hold itself out as religious, and has not adopted any religious views or positions."  Doc. 1, ¶ 17.   As noted above, Real Alternatives' objections to the contraceptive care imposed on its health insurance plan by the Mandate are purely "moral," and "based on science, reason, and non-religious philosophical principles."  *Id*. ¶ 18.   As such, the Contraceptive Mandate does not burden a fundamental right held by Real Alternatives, and Real Alternatives does not belong to a suspect class.  *See Hassan v. N.Y.C.*, 804 F.3d 277, 298-99 (3d Cir. 2015) (discussing suspect classifications).   We thus concur that rational basis

review applies.

"Under rational-basis review in an equal protection context, 'a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *U.S. v. Pollard*, 326 F.3d 397, 407 (3d Cir. 2003) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)).   Rational basis review is extremely deferential to the government.  "Under rational basis review, legislation enjoys a presumption of validity, and the plaintiff must negate every conceivable justification for the classification in order to prove that the classification is wholly irrational." *Brian B. v. Pa. Dep't of Educ.*, 230 F.3d 582, 586 (3d Cir. 2000); *see Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973) ("[T]he burden is on the one attaching the legislative arrangement . . . .").  Thus, Plaintiffs have a difficult hurdle to overcome.  However,

> a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.  To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

### b.    Defendants' First Justification Fails Rational Basis

## Review

Here, the administrative agencies responsible for the ACA classify and provide an exemption for religious employers that other employers do not enjoy. Real Alternatives argues that the distinct treatment for religious employers bears no rational relationship to a legitimate government interest. The Departments of Labor, Treasury and the HHS, however, give two reasons for classifying religious employers separately. The first is that

> [h]ouses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people of the same faith who share the same objection, and who would therefore be less likely than other people to use contraceptive services even if such services were covered under their plan.

78 Fed. Reg. 39,874-75 (July 2, 2013). Because it is simply inaccurate, we concur with Plaintiffs that this first justification fails rational basis review.

Though non-precedential, *March for Life v. Burwell*, No. 14-cv-1149, 2015 WL 5139099, (D.D.C. Aug. 31, 2015), deals with facts that bear a striking resemblance to those presented in the instant case. There, Judge Leon of the District Court for the District of Columbia determined that the Departments' justification fails rational basis review because it is simply counter factual. *See March for Life*, 2015 WL 5139099, at *15 (the Departments have "erred . . . in assuming that this trait is unique to such organizations. It is not."). We agree.

Simply put, there are other employers more likely than religious employers to hire people who share an objection to contraceptive coverage. For example, any employer, religious or not, who discourages the use of contraceptive care and actively seeks to employ those who share its objections would be more likely to hire employees who do not want to use contraceptive care than employers who are merely religious. Indeed, this description neatly matches Real Alternatives. In its reasoning, the Departments mistakenly conflate faith with an aversion to contraceptive care. There are many religious institutions and practitioners of religious faith who nonetheless condone certain uses of contraceptive care. Likewise, there are many non-religious employers, like Real Alternatives, that do not subscribe to a particular faith but adamantly discourage the use of contraceptives.

As Judge Leon points out, under this justification "it is not the belief or non-belief in God that warrants safe harbor from the Mandate. The characteristic that warrants protection [is] an employment relationship based in part on a shared objection to abortifacients . . . ." *March for Life*, 2015 WL 5139099, at *15. That characteristic is displayed by Real Alternatives, and if this were Defendants' sole rationale for the classification, Real Alternatives' Fifth Amendment claim would succeed.

### c.  Defendants' Second Justification Survives Rational Basis Review

However, the Defendants provide another justification for the classification. The Departments explain that the religious employer exemption exists due to "the effect on the religious beliefs of certain religious employers if coverage of contraceptive services were required in the group health plans in which employees in certain religious positions participate."  76 Fed. Reg. 46,621, 46,624 (Aug. 3, 2011).  The Departments also note that the exemption exists "to respect the religious interests of houses of worship and their integrated auxiliaries."  78 Fed. Reg. 39,874-75 (July 2, 2013).  Finally, the Departments state their concern that "[i]ncluded coverage of contraceptive services could impinge upon the religious freedom of certain religious employers."  76 Fed. Reg. 46,624 (Aug. 3, 2011).

These three statements combine to express an idea that is paramount to this Court's analysis today.  The effect of the Contraceptive Mandate upon religious beliefs, respect for religious groups, and the value of religious freedom are all central to the Departments' rationale in crafting the exemption.  These words stand for an ideal that is of predominant importance to law-making in the United States. Indeed, it occupies a prominent role in the Constitution itself.  For the reasons expressed below, we hold that the Departments have sufficiently articulated a legitimate interest in protecting religious freedom, and the Contraceptive Mandate

and its exemption therefore survive rational basis review.

### i.   Religious Freedom Constitutes a Legitimate Governmental Interest

In *March for Life*, Judge Leon cogently explains that the issue at hand is not whether the plaintiffs are the same as religious employers, but whether they are similarly situated. *March for Life*, 2015 WL 5139099, at *5. While he is correct in discerning that the two are similarly situated in their beliefs regarding the Contraceptive Mandate and contraceptive care, *id.*, it is not by their beliefs that the Departments have elected to differentiate the two. Rather, it is by the foundations for those beliefs. Where objections to the Contraceptive Mandate are grounded in religious views, courts and the legislature alike have held that accommodation is warranted. *See Hobby Lobby*, 134 S.Ct. at 2786 ("[N]o person may be restricted or demeaned in exercising his or her religion.").

In support of this view, a vast history of legislative protections exists to safeguard religious freedom. Moral philosophies, however, have been historically unable to enjoy the same privileged state. *See Priests for Life v. U.S. Dep't of Health & Human Servs.*, No. 13-5368, slip op. at 8 n.4 (D.C. Cir. May 20, 2015) (statement of Kavanaugh, J., dissenting from the denial of rehearing en banc) (emphasizing that the Religious Freedom Restoration Act "does not provide protection to philosophical, policy, political or personal beliefs"). Though large,

organized secular belief systems have been gaining protected treatment as well, *see Center for Inquiry v. Marion Circuit Court Clerk*, 758 F.3d 869 (7th Cir. 2014), the majority of precedent continues to support preferential treatment for religion under the law, without explicitly extending that treatment to include secular beliefs. Certainly, no legislative or judicial ruling has as of yet declared a moral belief such as that espoused by Real Alternatives to be entitled to accommodations historically provided to religion with the exception of *March for Life*.

In *Corporation of Presiding Bishop of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987), the Supreme Court reasoned that Section 702 of the Civil Rights Act, which allows religious organizations to engage in discriminatory employment practices on the basis of religion, does not violate the equal protection doctrine. There, plaintiffs argued that the government impermissibly distinguished between religious and secular employers. The Court found there, as we do now, that the classification was "rationally related to the legitimate purpose of alleviating significant interference with the ability of religious organizations to define and carry out their religious missions." *Amos*, 483 U.S. at 339. The Court further emphasized that, to be enforceable under the law, "[r]eligious accommodations . . . need not 'come packaged with benefits to secular entities." *Id*.

Real Alternatives argues that this rationale does not appear in the Departments' record as a justification for the exemption.  It states that "the government has not said churches must be exempt as a matter of religious freedom."  This is an egregious misstatement.  Page 46,624 of the Federal Register explains that commenters drew the Departments' attention to the issue that "included coverage of contraceptive services could impinge upon the *religious freedom* of religious employers."  76 Fed. Reg. 46,624 (Aug. 3, 2011) (emphasis added).  The ensuing amendments which directed the HRSA to draft the religious employer exemption were provided specifically "to allow HRSA the discretion to accommodate, in a balanced way, . . . these commenter concerns."  *Id.*  While perhaps not as succinctly expressed as this Court would like, this language nonetheless indicates the Departments' real concerns over religious freedom, and, contrary to Plaintiffs' argument, emphasizes respect for religious missions as a justification for the distinct and separate classification of religious employers.[11]

Additionally, Real Alternatives suggests that *Amos* does not apply because plaintiffs there "tried to negate the religious group exemption, not expand it."  Doc.

---

[11]  We acknowledge, as Plaintiffs argue, that the Departments do not specifically explain why religious employers' values or beliefs are paramount to moral philosophies such as that which plaintiffs espouse.  However, it is not necessary that they do so.  The Departments do not need to specifically compare and find wanting every other group or employer that might lay claim to an exemption in order to meet rational basis review.  They need only state their legitimate interest in formulating the exemption.  This they have done.

29, p. 24.  It is true that Real Alternatives argues that it too should benefit from the

exemption, and not, as the *Amos* plaintiffs argued, that the exemption should not

apply at all.  However, the overarching argument – that the exemption

impermissibly violates the equal protection doctrine of the Fifth Amendment – is

identical.  Further, while Plaintiffs request that the exemption be expanded to apply

to Real Alternatives, they also request a permanent injunction prohibiting

Defendants from applying the Contraceptive Mandate to Plaintiffs and their

insurers in any way that requires them to maintain coverage for services that

contradict their beliefs.  Doc. 1, p. 40 ¶ B.  By enjoining the Contraceptive

Mandate, the exemption would be moot, thus negating it in the same way that the

*Amos* plaintiffs requested.  The parity of this result, and the identical analysis

involved in each case, therefore makes the holding in *Amos* applicable here.

A Third Circuit case that the parties failed to reference in their briefings is

also instructive.  In *Wilkins v. Penns Grove-Carneys Point Regional School

District*, 123 Fed.Appx. 493 (3d Cir. 2005), the Penns Grove-Carneys Point

Regional School District adopted a mandatory school uniform policy, with an

exemption for objections based on sincerely held religious beliefs.[12]  *Wilkins*, 123

---

[12]  The school originally exempted students with "moral" objections to uniforms as well, but apparently this system proved unworkable.  *Wilkins*, 213 Fed.Appx at 494.

Fed. Appx. at 494.  Sherrie Wilkins, an Atheist, alleged violations of the Equal

Protection Clause of the Fourteenth Amendment, sought, and was denied a uniform

exemption for her two children.  As we too must ask, the Third Circuit there

inquired "whether the religious exemption to the school uniform policy is a

rational means of achieving a legitimate state end." *Id.* at 495.  Citing *Amos*, our

Court of Appeals held that "[t]he religious exemption is rationally drawn to further

the legitimate interest in accommodating students' free exercise of religion . . . ."

*Id.*  There, as here, protecting free exercise rights constitutes a legitimate

government concern that overcomes rational basis review.

> ii.     **Plaintiffs' Reliance on *Center for Inquiry* is Misplaced**

Plaintiffs allege that *March for Life* and *Center for Inquiry v. Marion Circuit

Court Clerk*, 758 F.3d 869 (7th Cir. 2014), argue against the stance we take here

today.  Plaintiffs are correct in their analysis of *March for Life*.  However, for the

following reasons, Plaintiffs' reliance on *Center for Inquiry* is misplaced.

*March for Life* and *Center for Inquiry* take similar positions, as they both

hold that "religiosity 'cannot be a complete answer' where . . . two groups with a

shared attribute are similarly situated 'in everything except a belief in a deity.'"

*March for Life*, 2015 WL 5139099, at *16 n.8 (quoting *Ctr. For Inquiry*, 758 F.3d

at 872).  We understand and appreciate the cogent points that those thoughtful

opinions draw with respect to this difficult issue.  However, at the outset we emphasize that both opinions are non-binding on this Court, and that Judge Easterbrook's rationale in *Center for Inquiry*, though persuasive, may well run afoul of Supreme Court precedent.  *See generally, Amos*, 483 U.S. 327 at 338-39 ("[r]eligious accommodations . . . need not 'come packaged with benefits to secular entities").[13]  Judge Leon chose to extend Judge Easterbrook's persuasive reasoning over the facts presented in *March for Life*.   However, as with Plaintiffs, we feel that Judge Leon's reliance upon Judge Easterbrook's rationale in *Center for Inquiry* is misplaced.  *Center for Inquiry* is rightly distinguishable from the facts at hand.

Though we do not question the sincerely held beliefs of the Plaintiffs, we detect a difference in the "philosophical views" espoused by Real Alternatives, and the "secular moral system[s] . . . equivalent to religion except for non-belief in God" that Judge Easterbrook describes in *Center for Inquiry*.  758 F.3d at 873. There, the Seventh Circuit references organized groups of people who subscribe to belief systems such as Atheism, Shintoism, Janism, Buddhism, and secular humanism, all of which "are situated similarly to religions in everything except

---

[13]  Whether religious exemptions should also be extended to philosophical belief systems akin to religion is an intriguing question that has not been fully reached by the Third Circuit nor the Supreme Court, nor by the facts of the instant case.  Accordingly, it will not be considered here today.

belief in a deity." *Id*. at 872.  These systems are organized, full, and provide a comprehensive code by which individuals may guide their daily activities.  Here, in stark contrast, we confront only Real Alternatives' mission statement – a brief, single sentence explaining that Real Alternatives is a business which "exists to provide life-affirming alternatives to abortion services throughout the nation." Doc. 1, ¶ 30.

Though based on moral beliefs, this single mission statement is not "equivalent to religion." *Ctr. for Inquiry*, 758 F.3d at 873.  It does not provide a comprehensive code to guide individuals in their day-to-day life challenges.  It does not operate to fill the same position in one's mind that religion can occupy. More akin to a political position with moral underpinnings than a coherent ideology, Real Alternatives' single mission statement is simply not comparable to a philosophic belief system such as Janism or Buddhism, which Judge Easterbrook argues cannot be distinguished from religion based on the absence of a belief in a deity alone.  Real Alternatives' belief, however, can and will be distinguished here today.

Like the Seventh Circuit, Judge Leon similarly asserts that "religiosity 'cannot be a complete answer' where . . . two groups with a shared attribute are similarly situated 'in *everything* except a belief in a deity." *March for Life*, 2015

WL 5139099, at *16 n.8 (quoting *Ctr. For Inquiry*, 758 F.3d at 872) (emphasis added).  The first characteristic noted by Judge Leon is satisfied – here, we have two groups.  The second characteristic is also satisfied, as the two groups do indeed share an attribute – their aversion to contraceptives.  But the analysis breaks down when we ask whether the third characteristic, whether these two groups are similarly situated in everything except belief in a deity, has been met.  They are not.  They share only one, albeit vehemently held, opinion.  In every other respect they are different.  Real Alternatives is an employer, a company, and not a belief system like those referenced above, and its single mission statement cannot guide believers comprehensively throughout life as a religion can.  For this reason, we feel that *Center for Inquiry*'s rationale is not applicable to the instant facts.  Thus, Judge Leon's reliance on *Center for Inquiry* shall not be duplicated here.

### iii.   Deleterious Effects if Singular Statements of Morality Were Held Akin to Religion

If we presume that Judges Easterbrook and Leon are correct in holding certain moral philosophies on par with religion, we emphasize that Plaintiffs' reasoning should still fail today.[14]  Allowing adherence to a single moral belief, even one with philosophical underpinnings, to be indistinguishable from religion

---

[14] We again stress the tension that exists regarding this determination as discussed *supra*, p. 37, and reemphasize that this Court does not rule on it here.

or an entire moral creed such as Atheism or Buddhism leads us down a slippery slope. If a singular moral view cannot be distinguished here, where else will such a classification fail? This is but one small inclusion – that moral, as well as religious employers with objections to contraceptive care should have an exemption. But many exemptions exist for religious groups and philosophic groups alike in order to respect their religious freedom, doctrines and missions. As Judge Leon notes,

> if an individual deeply and sincerely holds beliefs that are purely ethical or moral in source and content . . . those beliefs certainly occupy in the life of that individual a place parallel to that filled by God in traditionally religious persons. Recognizing the role morality plays in the lives of citizens, courts prohibit regulatory 'distinctions between religious and secular beliefs that hold the same place in adherents' lives.

*March for Life*, 2015 WL 5139099, at *16 (quoting *Welsh v. U.S.*, 398 U.S. 333, 340 (1970)). A finding such as that which Plaintiffs would have us make today ultimately leads to an all or none scenario: either the determination that any singular moral objection to a law that contains religious exemptions also has standing, or else that all such exemptions should fail.

We find support for this extended analysis in *Cutter v. Wilkinson*, 544 U.S. 709 (2005). There, the Supreme Court reversed a Sixth Circuit decision that would have invalidated the Religious Land Use and Institutionalized Persons Act

(RLUIPA)[15] as "impermissibly advancing religion by giving greater protection to religious rights than other constitutionally protected rights." *Cutter*, 544 U.S. at 724.  The Supreme Court stressed that the "[w]ere the Court of Appeals' view the correct reading of our decisions, all manner of religious accommodations would fall.  Congressional permission for members of the military to wear religious apparel while in uniform would fail," along with other accommodations, such as the provision of chaplains for inmates, and allowances for "prisoners to assemble for worship, but not for political rallies." *Id.*  Though *Cutter* focused primarily on whether RLUIPA violated the Establishment Clause, and did not involve a Fifth Amendment concern, we nonetheless find the Court's analysis instructive here in that finding a singular moral objection to law on par with a religious objection suggests that a watershed of similar objections may follow.

### d.   Conclusions Pursuant to Plaintiffs' Fifth Amendment Claim

Ultimately, we do not, and need not, decide whether philosophic creeds should obtain standing akin to religion in the eyes of the law.  Rather, we reject Plaintiffs' argument and conclude that Real Alternatives' objection to

---

[15]  RLUIPA provides, in relevant part, that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution" unless the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means" of furthering that interest.  42 U.S.C. § 2000cc-1(a).

contraceptive care does not similarly situate it to religious employers with religious objections to the Contraceptive Mandate.  Further, the government's stated interest in protecting religious freedom, which this non-religious employer is not entitled to, serves a legitimate government purpose.

No one can question that religious groups are placed upon a pedestal of protection by this nations' law makers.  *See Korte v. Sebelius*, 735 F.3d 654, 677 (7th Cir. 2013) (acknowledging that the religious-liberty doctrine as expounded by the RFRA "'gives special solicitude to the rights of religious organizations *as religious organizations*, respecting their autonomy to shape their own missions, conduct their own ministries, and generally govern themselves in accordance with their own doctrines . . . .'").  The Contraceptive Mandate, without the religious exemption, would run headlong into such legislative protections for religion.  It would not survive the confrontation.  Similar protections do not, and should not, exist for singular moral objections, and arguably do not yet exist for objections grounded in overarching moral philosophies.  Thus the Departments, in drafting the Contraceptive Mandate, had no reason to treat groups that espouse these views as equivalents to religion.

The long history of precedent supporting respect for and deference to religious freedom as a legitimate government interest supports the Departments'

classification.  *See Amos*, 483 U.S. at 334 ("This Court has long recognized that the

government may (and sometimes must) accommodate religious practices" (quoting

*Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144-45 (1987)))*;*

*Wilkins*, 123 Fed.Appx. at 495.  As such, the Departments' decision is certainly not

"wholly irrational," as a classification must be in order to wither under Fifth

Amendment scrutiny.  *Brian B. v. Pa. Dep't of Educ.*, 230 F.3d 582, 586 (3d Cir.

2000).  Nor is the discrimination between religious employers and non-religious

employers "so unjustifiable as to be violative of due process."  *Schlesinger v.*

*Ballard*, 419 U.S. 498, 500 (1975).  Rather, accommodation for religious beliefs

has long been a pillar of our legal foundation, and if it is to be torn down, it is not

the role of this District Court to do so today.

## 2.  Claims Pursuant to the Administrative Procedure Act

In a claim similar to Plaintiffs' Fifth Amendment violation allegation,

Plaintiffs allege that the Contraceptive Mandate is arbitrary and capricious under

the Administrative Procedure Act ("APA").  Plaintiffs also allege that the

Contraceptive Mandate is contrary to existing federal law, including the Weldon

Amendment of the Consolidated Security, Disaster Assistance, and Continuing

Appropriations Act of 2009, Pub. L. 110-329, Dic. A, Sec. 101, 122 Stat. 3574,

3575 (Sept. 30, 2008), the Church Amendment, 42 U.S.C. § 300a-7(d), the

Religious Freedom Restoration Act ("RFRA"), and, pursuant to their above claim,

the Fifth Amendment of the United States Constitution.  For the reasons that

follow, we disagree.

> **a.     The Contraceptive Mandate is Not Arbitrary &
> Capricious Under the APA and is Not Contrary the
> Constitution**

The APA permits a reviewing court to "hold unlawful and set aside agency

action" that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law" or "(B) contrary to [a] constitutional right, power, privilege

or immunity."  5 U.S.C. § 706(2)(A) & (B).  For the reasons discussed above, we

have already determined that the Contraceptive Mandate is not contrary to the Fifth

Amendment equal protection doctrine.  Thus, insofar as Plaintiffs invoke the Fifth

Amendment to invalidate the Contraceptive Mandate pursuant to the APA, this

argument is likewise without merit.

Plaintiffs also argue that the religious exemption violates the APA because it

represents an arbitrary and capricious classification.  Doc. 1, ¶ 149 ("The Mandate

is arbitrary and capricious within the meaning of [the APA] because it exempts

churches which are merely "likely" to have employees who oppose contraception,

but refuses to exempt Real Alternatives that is explicitly an anti-abortion

organization only hiring anti-abortifacient employees.").  This argument mirrors

the one expressed above.  Finally, Plaintiffs also argue that the Contraceptive

Mandate is arbitrary and capricious under the APA because no rational government

interest is served "by forcing people to accept abortifacient coverage as a condition

of having health insurance when those people morally or religiously oppose

abortifacient coverage . . . ."  *Id.* ¶ 152.

The standard for determining whether an APA violation exists under the

arbitrary and capricious standard is markedly similar to rational basis review.

Under the APA, "[a]gency action is arbitrary and capricious if the agency offers

insufficient reasons for treating similar situations differently.  If an agency makes

an exception in one case, then it must either make an exception in a similar case or

point to a relevant distinction between the two cases."  *Nazareth Hosp. v. Dept. of

Heath & Human Servs.*, 747 F.3d 172, 179-180 (3d Cir. 2014) (internal citations

omitted).  The Third Circuit has explained that

> "[r]eview of an equal protection claim in the context of agency action
> is similar to that under the APA. . . . [A]n agency's decision must be
> upheld if under the Equal Protection Clause, it can show a "rational
> basis" for its decision.  As such, 'the equal protection argument can be
> folded into the APA argument, since no suspect class is involved and
> the only question is whether the treatment of [plaintiffs] was rational."

*Id.* (quoting *Ursack Inc. v. Sierra Interagency Black Bear Grp.*, 639 F.3d 949, 955

(9th Cir. 2011)).

Given this standard, we see no need to repeat the analysis performed above. Plaintiffs' arbitrary and capricious claims fail for the same reasons that their Fifth Amendment equal protection claim lacked merit.  The Departments' decision to craft a religious exemption is rationally drawn to further their legitimate interest in accommodating religious employers' free exercise of religion.  Whether a rational government interest exists in providing contraceptive coverage for people who may not use it is addressed thoroughly in the context of Plaintiffs' RFRA claims.  For the same reasons that those claims fail as addressed below,[16] we find that they fail here as well.

### b. The Contraceptive Mandate is Not Contrary to Federal Law

In an additional argument pursuant to their APA claim, Plaintiffs also argue that the Contraceptive Mandate violates the APA because it runs contrary to existing federal law.  Doc. 1, ¶ 154-56.  In support of their claim, Plaintiffs point to the Weldon Amendment, the ACA itself, and the Church Amendment.  We consider each argument in turn.

### i. Weldon Amendment

The Weldon Amendment is a rider to an appropriations bill which provides

---

[16] *Infra* Section IV.B.3.

that no funds may be made available to a federal agency or program if that agency or program "subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." Pub. L. No. 112-74, §§ 506, 507, 125 Stat. 786, 1111-12.[17] *See Geneva Coll. v. Sebelius*, 929 F.Supp.2d 402, 448-49 (W.D.Pa. 2013) (discussing the Weldon Amendment).

Plaintiffs' use of the Weldon Amendment in this context fails to state a claim for which relief can be granted.  Though Plaintiffs may believe that certain FDA-approved contraceptives cause abortions, federal law has never equated emergency contraceptives with abortion. *See* 62 Fed. Reg. 8610-01 (Feb. 25, 1997); *Mich. Catholic Conf. v. Sebelius*, 989 F.Supp.2d 577, 593 (W.D. Mich. 2013), *aff'd*, 755 F.3d 372, 396-97 (6th Cir. 2014) (judgment vacated for further consideration in light of *Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751 (2014) by *Mich. Catholic Conference v. Burwell*, 135 S.Ct. 1914 (2015)) ("Plaintiffs believe that FDA-approved emergency contraceptives are 'abortion-inducing products' – as is their right.  However, federal law does not define them as such . . . .  Accordingly, the regulations are not contrary to law, and plaintiffs'

---

[17] Plaintiffs' brief cites to an earlier version of the Weldon Amendment that does not contain the quoted language.  Plaintiffs intend to refer to the 2012 version, which does contain the language related to protection of health care entities' views on abortion.  Therefore, the Court will rely upon the current version of the statute.

APA claim fails.").  Nor did the Weldon Amendment itself ever intend to

promulgate that interpretation.  In fact, in proposing the Amendment that now

bears his name, Representative Weldon specifically clarified that

> [t]here have been people who have . . . tried to assert that the language
> in this bill would bar the provision of contraceptions services . . . .
> Please show me in the statute where you find that interpretation.  I
> think it could be described as a tremendous misinterpretation or a
> tremendous stretch of the imagination.  The provision of contraceptive
> services has never been defined as abortion in Federal statute, nor has
> emergency contraception, what has commonly been interpreted as the
> morning-after pill.  Now, some religious groups may interpret that as
> abortion, but we make no reference in this statute to religious groups
> or their definitions; and under the current FDA policy that is
> considered contraception, and it is not affected at all by this statute.

148 Cong. Rec. H6566, H6580  (daily ed. Sept. 25, 2002).

Plaintiffs offer no opposition to the points raised above, nor can they.

Rather, they argue that the definition itself should be changed, because in their

view, some of the contraceptive products cause abortion.  This argument was

already raised by the plaintiffs in *Geneva College v. Sebelius*, 929 F.Supp.2d 402,

449 (W.D.Pa. 2013).  There, the Western District held that, as "plaintiffs did not

identify any legal basis for finding that a statutory definition of abortion must

include emergency contraceptives . . . the claim based upon the Weldon

Amendment is not sufficient to survive."  *Id*.  We reach the same conclusion due to

Plaintiffs' lack of a legal basis for their proposed definition and, accordingly, find

48

that Plaintiffs' argument fails.

## ii.      Claim Pursuant to the ACA

For the same reason that the Weldon Amendment argument fails, Plaintiffs'

ACA argument fails as well.  Plaintiffs argue that the Contraceptive Mandate

violates the provision of the ACA which states "nothing in this title . . . shall be

construed to require a qualified health plan to provide coverage of [abortion]

services as part of its essential health plan benefits for any plan year."  42 U.S.C. §

18023(b)(1)(A)(i).  Plaintiffs reiterate and again rely solely on their belief that

certain FDA-approved contraceptives constitute abortion.  Again, we find that the

government's use of the word "abortion," was never intended to include

emergency contraceptives.  Plaintiffs cannot point to a single statutory or

regulatory definition of abortion that includes emergency contraceptives.[18]  As

such, the government's definition of the term is entitled to deference, particularly

given the length of time and consistency with which their version has been used.

*See Bhd. of R.R. Signalmen v. Surface Transp. Bd.*, 638 F.3d 807, 815 (D.C. Cir

---

[18]  Nor could Appellants Michigan Catholic Conference and Catholic Family Services in their identical argument, which the Sixth Circuit found meritless.  *See Mich. Catholic Conference & Catholic Family Servs. v. Burwell*, 755 F.3d 372, 396-97 (6th Cir. 2014) (noting that "the appellants have neither asserted nor argued nor presented evidence that the federal government classifies these drugs as abortifacients . . . .") (judgment vacated in light of *Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751 (2014) by *Mich. Catholic Conference v. Burwell*, 135 S.Ct. 1914 (2015)).

49

2011) (according particular deference to an agency's longstanding interpretation of a word or phrase).  Thus, we hold that Plaintiffs' ACA claim also fails.

### iii.    Church Amendment

In their final APA claim, Plaintiffs allege that the Contraceptive Mandate is in violation of the Church Amendment as it applies to the Real Alternatives Employees.  The Church Amendment provides that

> [n]o individual shall be required to perform or assist in the performance of any part of a health service program or research activity funded in whole or in part under a program administered by the Secretary of Health and Human Services if his performance or assistance in the performance of such part of such program or activity would be contrary to his religious beliefs or moral convictions.

42 U.S.C. § 300a-7(d).

The Church Amendment is part of a larger statutory scheme allowing the Secretary of Health and Human Services to "make grants and to enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services."  42 U.S.C. § 300(a).  As an initial matter, only the Real Alternatives Employees are potentially affected by the Church Amendment, as by its language the Amendment explicitly applies only to individuals.  *See Geneva Coll. v. Sebelius*, 929 F.Supp.2d at 449 (noting that the Church Amendment applies only to individuals).  The parties

50

concur on this point.

Like plaintiffs in *Geneva College v. Sebelius*, however, Plaintiffs here "do not indicate how their purchase of health insurance is related to grant funding for "voluntary family planning projects," the stated purpose of the Church Amendment and its greater statutory scheme.  42 U.S.C. § 300a-7(d).  *See Geneva Coll. v. Sebelius*, 929 F.Supp.2d at 449-50.  As the district court there noted, "without a showing of this connection between their actions and the projects and services subject to the Church Amendment, the . . . Plaintiffs lack standing to advance their claim that the mandate violates the Church Amendment."  *Id*. (citing *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153 (1970)).  In fact, like the *Geneva* plaintiffs, Plaintiffs here give no explanation and rely on no legal authority in support of their position at all.

This attenuation is because of a further disconnect regarding the purpose of the Church Amendment, which additionally weakens Plaintiffs' claim.  Plaintiffs' Complaint indicates that Real Alternatives purchases its employee health insurance coverage from a company in the health insurance market, and not from HHS or an HHS-administered health insurance program, which the Church Amendment is intended to impact.  *See Geneva Coll. v. Sebelius*, 929 F.Supp.2d at 449 (holding that, where individuals obtain health insurance through their employer, who in turn

purchases coverage from the private health insurance market (and not the HHS), the Church Amendment is not implicated).  Plaintiffs thus lack standing to bring suit pursuant to the Church Amendment, and insofar as Plaintiffs' ACA claims relate to the Church Amendment, they must also fail.

Thus, for the reasons expressed above, and also because of the analysis in regards to RFRA that follows below, Plaintiffs' second claim for relief, alleging a violation of the Administrative Procedure Act, is dismissed.[19]

### 3.   Claim Pursuant to Real Alternatives Individual Employees' Rights to Religious Exercise Under RFRA

In their final Count, Plaintiffs argue that the Defendants have violated RFRA by forcing Real Alternatives' employees to obtain and maintain health insurance which includes coverage for drugs and devices that violate their religious beliefs.  Doc. 1, ¶ 2.  We note at the outset that Plaintiffs' RFRA claims apply only to the Real Alternatives' Employees, because Real Alternatives does not assert religious objections to the Contraceptive Mandate.  As discussed above, Real Alternatives' objections are based solely on moral grounds.

### a.   Standing

---

[19]  In their APA claim, Plaintiffs also alleged that "Defendants did not adequately consider or respond to comments they received indicating that groups like Real Alternatives should be exempt from the Mandate."  Doc. 1, ¶ 148.  However, with the exception of a singular passing reference, neither party addressed this allegation in the responsive pleadings.  Thus we decline to address it here as well.

Defendants first assert a standing argument that mirrors the content of the standing argument addressed at the outset of this Discussion.  Namely, Defendants argue that, like Real Alternatives, the individual Plaintiffs too should be required to show redressability in the form of proof that they would be able to obtain acceptable individualized health care coverage from a third-party insurer.  Unlike Real Alternatives, which is an employer seeking to purchase a plan that conforms with its moral beliefs on behalf of its employees, here we address whether the Real Alternatives Employees themselves have shown that they, as individuals, could access individual insurance plans that conform with their religious beliefs from a provider in the open market.

This secondary standing issue arises due to our holding above.  As we have already ruled, Real Alternatives, by virtue of its moral objections to contraceptive care alone, is not entitled to an exemption from the Contraceptive Mandate. Therefore, Real Alternatives is required to provide health insurance to its employees that conforms with the ACA.  Therefore, the only way for Real Alternatives' Employees to obtain morally and religiously acceptable coverage would be for them to decline the plan that their employer, Real Alternatives, provides, and purchase individualized health care in the open market.

As noted in the Factual Background, the Departments made clear that

"[b]ecause the HRSA's discretion to establish an exemption applies only to group health plans sponsored by certain religious employers and group health insurance offered in connection with such plans, health insurance issuers in the individual health insurance market would not be covered under any such exemption."  76 Fed. Reg. 46,623-24 (Aug. 3, 2011).  Because they are not covered by an exemption, individual health insurance providers throughout the nation are currently unable to offer individual health coverage that conforms with Real Alternatives' Employees' beliefs.  Real Alternatives' Employees offer no evidence that they would be able to obtain acceptable coverage, and proffer no indication that an insurer had been willing to offer acceptable individualized coverage prior to the enforcement of the Contraceptive Mandate.[20]  We therefore find the Defendants' argument that Plaintiffs' RFRA claim would not be redressable, even in the instance that this Court were to issue a favorable ruling, to be significantly more persuasive than it was in the first instance.

### b.  The Contraceptive Mandate Does Not Impose a Substantial Burden under RFRA

---

[20]  The absence of this evidence is an important distinction from the argument that Plaintiffs made with respect to standing for Real Alternatives in Section IV.A, *supra*.  The proof that Real Alternatives' insurance provider had been willing to provide an acceptable plan before the Contraceptive Mandate, combined with the current availability of such coverage on the open market, contributed greatly to our determination there.  Here, however, both of these factors are lacking, making the two analyses distinct.

Even if Plaintiffs had conclusively established standing to challenge the requirement that contraceptive services be included in their health care, we are not convinced that instituting such coverage over individuals who do not want it constitutes a substantial burden in violation of RFRA.

Under RFRA, the "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a).[21]  RFRA was enacted by Congress in 1993, following the Supreme Court's Ruling in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990).  There, the Supreme Court rejected the balancing test previously used to evaluate claims under the Free Exercise Clause of the First Amendment, as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972).  In those previous cases, "the Court asked whether the challenged law substantially burdened a religious practice, and, if it did, whether that burden was justified by a compelling governmental interest."  *Geneva Coll. v. Sec'y U.S. Dep't of Health & Human*

---

[21]  The Third Circuit has noted that, in cases applying RFRA to federal laws and regulations, we must presume that the application is constitutional unless the issue is specifically raised.  Here, no such issue has been addressed.  *See Geneva Coll. v. Sec'y U.S. Dep't of Heath & Human Servs.*, 778 F.3d 422, 430 n.6 (3d Cir. 2015).

*Servs.*, 778 F.3d at 430 (describing the history of RFRA).  However, in *Smith*, the Court determined that the original test would "open the prospect of constitutionally required religious exemptions from civil obligations of every conceivable kind–ranging from compulsory military service to the payment of taxes," thereby impermissibly expanding the scope of the First Amendment's protection of religious liberty.  494 U.S. at 888-89 (internal citations omitted).

Congress responded by passing RFRA to legislatively overrule the *Smith* standard.  RFRA's stated purposes are "(1) to restore the compelling-interest test as set forth in *Sherbert* and *Yoder* and to guarantee its application in all cases where free exercise of religion is substantially burdened; and (2) to provide a claim or defense to persons whose religious exercise is substantially burdened by the government."  42 U.S.C. § 2000bb(b).  The Supreme Court has described RFRA as "adopt[ing] a statutory rule comparable to the constitutional rule rejected in *Smith*." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006).

Here, Plaintiffs contend that they "unquestionably maintain a religious belief against the provision and use of abortifacient contraceptives, and the Mandate substantially burdens those beliefs [sic] by coercing the individual Plaintiffs to maintain coverage of abortifacient contraceptives."  Doc. 35, pp. 13-14.  Plaintiffs

56

further contend that they have a "sincere religious belief against participating in

health insurance coverage which provides coverage for abortifacients, and also

implicates their religious belief that God commands them to provide for their own

and their families' health." *Id*.

While we may not question the plaintiffs' religious beliefs, Congress

nonetheless requires a "qualitative assessment of the merits of the [Plaintiffs']

RFRA claims." *Geneva*, 778 F.3d at 435. "It is virtually self-evident that the Free

Exercise Clause does not require an exemption from a governmental program

unless, at a minimum, inclusion in the program actually burdens the claimant's

freedom to exercise religious rights." *Tony & Susan Alamo Found. v. Sec'y of

Labor*, 471 U.S. 290, 303 (1985). "Whether a burden is "substantial" under RFRA

is a question of law, not a question of fact." *Geneva*, 778 F.3d at 442 (citing

*Mahoney v. Doe*, 642 F.3d 1112, 1121 (D.C. Cir. 2011). Thus, "RFRA calls for a

threshold inquiry into the nature of the burden placed on the [plaintiffs'] free

exercise of religion: "substantial" is a term of degree that invites the courts to

distinguish between different types of burdens." *Id.* (citing *Korte*, 735 F.3d at 708

(Rovner, J., dissenting)).

In accordance with this standard, we are required to objectively assess

whether the maintenance of contraceptive coverage does, in fact, constitute a

substantial burden on Plaintiffs' exercise of their religious freedom.  In doing so,

"[w]e may consider the nature of the action required of the appellees, the

connection between that action and the appellees' beliefs, and the extent to which

that action interferes with or otherwise affects the appellees' exercise of

religion–all without delving into the [Plaintiffs'] beliefs."  *Geneva*, 778 F.3d at 436

(citing *Korte*, 735 F.3d at 710 (Rovner, J., dissenting)).

The Third Circuit cites the D.C. Circuit's analysis in *Kaemmerling v.*

*Lappin*, 553 F.3d 669, 679 (D.C. Cir. 2008), as an instructive example.  There, the

court

> [a]ccepted[ed] as true the factual allegations that Kaemmerling's
> beliefs are sincere and of a religious nature–but not the legal
> conclusion, cast as a factual allegation, that his religious exercise is
> substantially burdened.'  The court further explained: 'we conclude
> that Kaemmerling does not allege facts sufficient to state a substantial
> burden on his religious exercise because he cannot identify any
> 'exercise' which is the subject of the burden to which he objects.'"

*Id*.  As in *Kaemmerling*, though Plaintiffs have stated that they are substantially

burdened by the Contraceptive Mandate due to their sincerely held religious

beliefs, this is a legal conclusion that requires our further consideration.

The required analysis is complex indeed.  Whether the Contraceptive

Mandate's requirement that individuals maintain coverage for contraceptive

services constitutes a substantial burden (as opposed to employers' provision of

insurance) is an issue of first impression in the Third Circuit.  Neither party can

direct us to case law that is on point.[22]  Fortunately, we have extensive precedent to

look to for examples of other impositions that the Supreme Court has found to

constitute a substantial burden under RFRA.

In the landmark case of *Bowen v. Roy*, 476 U.S. 693, 696 (1986), the

plaintiff, a Native American, argued that the required use of his daughter's social

security number to obtain welfare benefits constituted a substantial burden on her

religious freedom.  He believed that the use of the number would "'rob the spirit'

of his daughter and prevent her from attaining greater spiritual power."  476 U.S. at

696. There, the Supreme Court disagreed that the government's behavior could be

subjected to RFRA and found that the plaintiff was not substantially burdened.

Similarly, in *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S.

439 (1988), the Supreme Court found that the burden imposed upon Native

Americans due to "the disruption of the natural environment" caused by the

---

[22]  Plaintiffs rely on the Supreme Court's holding in *Burwell v. Hobby Lobby*, 134 S.Ct. 2751, 2778 (2014), to argue that the coverage they are required to maintain has been found to substantially burden their religious exercise.  Plaintiffs patently mislead the Court in their analysis.  Plaintiffs' briefings, which cite to *Hobby Lobby* as finding that *maintaining* coverage is substantially burdensome, (*see* Doc. 35, p. 14) are counter factual.  Rather, the quotation to which Plaintiffs point indicates that it is the *provision*, and not the maintenance, of coverage that the Court finds in violation of RFRA, particularly given the availability of less restrictive means of achieving the governmental purpose at issue.  Plaintiffs fail to address, and indeed attempt to obfuscate, this important distinction.

construction of a road through land sacred to their religious practices was not

sufficiently burdensome.  485 U.S. at 447-48.  In reaching this conclusion, the

Court further explained that

> a government action does not constitute a substantial burden, even if
> the challenged action "would interfere significantly with private
> persons' ability to pursue spiritual fulfillment according to their own
> religious beliefs," if the government action does not coerce the
> individuals to violate their religious beliefs or deny them "the rights,
> benefits, and privileges enjoyed by other citizens."

*Geneva,* 778 F.3d at 442 (quoting *Lyng,* 485 U.S. at 449).

Here, as in *Bowen* and in *Lyng,* we need not inquire whether Plaintiffs'

beliefs are sincere, and neither do we question their feelings that those beliefs have

been violated by the Contraceptive Mandate.  Rather, as the Court held in the cases

discussed above, we find that the burden the Plaintiffs endure is not substantial

*enough* to violate the Free Exercise Clause.  *See Lyng,* 485 U.S. at 447 (disagreeing

that "the burden on [respondents] religious practices is *heavy enough* to violate the

free exercise clause") (emphasis added).

In order to prevail under the substantial burden test, "plaintiffs must show

more than a governmental action that violates their sincerely held religious beliefs;

they must show that the governmental action forces [plaintiffs] to modify [their]

own behavior in violation of those beliefs."  *Priests for Life v. U.S. Dep't of Health*

*& Human Servs.,* 7 F.Supp.3d 88, 102-03 (D.D.C. 2013) (citing *Kaemmerling,* 553

F.3d at 679).  This Plaintiffs have not done.  Like the challenges in the cases discussed above, the Contraceptive Mandate simply does not cause Plaintiffs to modify their behavior in violation of their beliefs – arguably they have not modified any behavior at all.  They would still have maintained insurance coverage, albeit of a different and more limited nature, regardless of the Contraceptive Mandate.[23]  Thus, they would always have taken the same steps to maintain coverage that the government requires them to take now, and their behavior has not been modified.  Rather, it is the behavior of a third party, the insurer, that the government modifies by requiring the insurer to provide additional services to Plaintiffs.  As the Third Circuit recently noted in a similar case, "[t]he Supreme Court has consistently rejected the argument that an independent obligation on a third party can impose a substantial burden on the exercise of religion in violation of RFRA."  *Geneva*, 778 F.3d at 440.

In *Geneva*, the Third Circuit held that requiring religious employers to self-indicate their religious objections on a form notice did not constitute a substantial

---

[23]  Plaintiffs aver that maintaining insurance coverage is an important part of their religious beliefs.  Doc. 1, ¶ 47 ("The employees, as a matter of religious belief, further believe that part of God's command to take care of one's health includes maintaining health insurance.").

burden. *Id.*[24]  In its rationale, the court noted that the form was no different, and in

fact more easily navigable, than many that the government required the plaintiffs to

complete for tax and other organizational purposes.  Given that analysis, we cannot

in good conscience find that a burden which, unlike that considered in *Geneva*,

requires no independent  affirmative act on the Plaintiffs' part, is substantial

enough to run afoul of the RFRA.[25]

Judge Leon argues against this analysis in *March for Life* when he notes that

"health insurance does not exist independently of the people who purchase it."  *See*

*March for Life*, 2015 WL 5139099, at *20.  It is true that those who maintain

---

[24]  The Supreme Court recently granted certiorari over this holding.  *Geneva Coll. v. Burwell*, 136 S.Ct.445 (Mem), No. 15-191, 2015 WL 4765464, 84 USLW 3096 (Nov. 6, 2015).

[25]  We also note the D.C. Circuit's decision in *Kaemmerling*, 553 F.3d at 674. There, a prisoner challenged the government's extraction and use of his DNA as a substantial burden on his religious beliefs.  The court noted that it was not the collection of the DNA, but its use to which Kaemmerling objected, and held that "the government's extraction analysis, and storage of Kaemmerling's DNA information does not call for Kaemmerling to modify his religious behavior in any way–it involves no action or forbearance on his part, nor does it otherwise interfere with any religious act in which he engages.  Although the government's activities . . . may offend Kaemmerling's religious beliefs, they cannot be said to hamper his religious exercise because they do not pressure [him] to modify his behavior and to violate his beliefs."
Here, health care coverage is not objected to by Plaintiffs.  Indeed, they aver that health care coverage is a requirement of their beliefs, as maintaining it "implicates their religious belief that God commands them to provide for their own and their families' health."  Doc. 35, p. 14.  Rather, it is the type of health care that the government mandates that insurance companies must provide to which Plaintiffs object.  However, like Kaemmerling, once the health care is obtained, there is no further modification, action, or forebearance required on the part of the Plaintiffs.  They may continue on practicing their religious beliefs as they see fit and, like any other health care participant with religious objections, need not invoke the provisions of the coverage to which they object.

coverage are known as "participants." *Id.*  We acknowledge that a burden does exist here.  However, we reiterate that this burden is not *substantial enough* to violate RFRA.  Many with religious objections to a wide variety of services covered by insurance plans are similarly situated to Plaintiffs.  As the Seventh Circuit notes in *Grote v. Sebelius*, "contraceptive care is by no means the sole form of heath care that implicates religious concerns."  *Grote v. Sebelius*, 708 F.3d 850, 866 (7th Cir. 2013).  Rather, "artificial insemination and other reproductive technologies; genetic screening; counseling and gene therapy; preventative and remedial treatment for sexually transmitted diseases; sex reassignment; vaccination; organ transplant from deceased donors;" blood transfusions; and, in some religions, virtually all conventional medical treatments, are objectionable.  *Id.* Coverage for many of these services is required by the ACA.  Yet no court has as of yet permitted an individual to demand a health plan tailored to his or her exact religious beliefs, and no insurance provider supplies one.  A finding that coverage for one set of objectionable services constitutes a substantial burden would imply that coverage for all such services imposes a substantial burden.  Then, by Plaintiffs' interpretation, only by allowing all such objectors to opt out of the objectionable coverage would RFRA be satisfied.  This would render the health care system totally unworkable.  Conversely, in requiring Plaintiffs to maintain this

coverage, they are not enduring a burden unique from that which other objectors too must shoulder.

Further, as noted by *Geneva*, it is the government that imposes the requirement upon third party insurers to provide the coverage to which Plaintiffs object. 778 F.3d at 440. To remedy the perceived violation, the government itself would have to modify its behavior. This plainly runs afoul of Supreme Court precedent, which in the context of *Bowen* states:

> [n]ever to our knowledge has the Court interpreted the First Amendment to require the Government itself to behave in ways that the individual believes will further his or her spiritual development of that of his or her family. The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens. Just as the Government may not insist that appellees engage in any set form of religious observance, so appellees may not demand that the Government join in their chosen religious practices by refraining from using a number to identify their daughter. The Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can extract from the government. . . . The Free Exercise Clause affords an individual protection from certain forms of governmental compulsion; it does not afford an individual a right to dictate the conduct of the government's internal procedures.

*Geneva*, 778 F.3d at 440 (quoting *Bowen*, 476 U.S. at 699-700) (internal quotations omitted). In echoing the principles of *Bowen*, we cannot find that the Real Alternatives Employees' interpretation of RFRA compels the government to change its regulation of insurance providers' coverage requirements.

## c.     The Contraceptive Mandate Furthers a Compelling Government Interest

In its briefing, the government emphasizes that, even if maintaining health insurance for services that conflict with Plaintiffs' sincerely held religious beliefs constitutes a substantial burden, that burden is the least restrictive means of furthering a compelling government interest. *See* Doc. 27, p. 24.  We have already determined that the threshold question of whether a substantial burden has occurred negates the applicability of RFRA to the instant case.  However, even if the Contraceptive Mandate imposed a substantial burden upon the individual Plaintiffs' exercise of religion, the Mandate would nonetheless survive scrutiny under RFRA because it constitutes the least restrictive means of furthering a compelling government interest.

In order to survive scrutiny pursuant to RFRA, the application of the Contraceptive Mandate must be "in furtherance of a compelling interest; and the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(a).  This analysis was detailed further in *Hobby Lobby*, where the Court explained that

> RFRA . . . contemplates a "more focused" inquiry: It requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person' – the particular claimant whose sincere exercise of religion is being substantially burdened.  This requires us to look beyond broadly

formulated interests and to scrutinize the asserted harm of granting
specific exemptions to particular religious claimants – in other words,
to look to the marginal interest in enforcing the contraceptive mandate
in these cases.

*Hobby Lobby*, 134 S.Ct. at 2779 (internal quotations and citations omitted).

Ultimately, in *Hobby Lobby*, the Court found that requiring closely-held for-profit

employers to provide contraceptive coverage to their employees was contrary to

the RFRA, not because the Contraceptive Mandate did not serve a compelling

interest, but because its method was not the least restrictive means of furthering

that interest.  Importantly, it presumed (without deciding) that "the interest in

guaranteeing cost-free access to the four challenged contraceptive methods is

compelling within the meaning of RFRA" and noted that  "[u]nder our cases,

women (and men) have a constitutional right to obtain contraceptives." *Id.* at 2780

(citing *Griswold v. Connecticut*, 381 U.S. 479, 485-86 (1965)).

Five members of the Court signed on to opinions that appear more

determinative in regard to this essential issue.  In his concurrence, Justice Kennedy

emphasized the importance of the Court's assumption that the Contraceptive

Mandate "here at issue furthers a legitimate and compelling interest in the health of

female employees." *Id.* at 2786.  Writing for four additional justices in her dissent,

Justice Ginsburg too voiced the importance of universal access to contraceptive

care.  The benefits that the Contraceptive Mandate provides are, in her words,

"concrete, specific, and demonstrated by a wealth of empirical evidence." *Id*. at 2799.

Though not strictly determinative here, we nonetheless find the sentiment expressed by the Supreme Court to be clear and guiding.  Even without its direction, the overarching benefits that contraceptive care provides gives us no pause in concluding that the Contraceptive Mandate furthers the government's compelling interest in promoting public health and gender equality.  Though general references to "public health" and "gender equality" are broad and vague terms, the Defendants have provided sufficient specific examples of the benefits of contraceptive care and we are persuaded that a general rule of the nature proscribed by the Contraceptive Mandate serves a compelling interest.  We begin first with the Defendants' asserted interest in gender equality.

### i.      Gender Equality

The negative effects that women suffer when they are unable to obtain desired contraceptive services are well documented.  "Unintended pregnancies elevate health risks for women and children and impose other costs on society. Women whose pregnancies are unintended are more likely to experience depression, anxiety, or domestic violence during those pregnancies." *Priests for Life*, 772 F.3d at 262 (citing IOM REPORT at 103).  However,

67

> the mandated contraception coverage enables women to avoid the
> health problems unintended pregnancies may visit on them and their
> children.  The coverage helps safeguard the health of women for
> whom pregnancy may be hazardous, even life threatening.  And the
> mandate secures benefits wholly unrelated to pregnancy, preventing
> certain cancers, menstrual disorders, and pelvic pain.

*Hobby Lobby*, 134 S.Ct. at 2799 (Ginsburg, J., dissenting) (internal citations

omitted).

Because these health obstacles are unique to women, access to treatment for

them plays an important role in ensuring that women continue to access the

workplace and the class room.  And that such treatment be affordable is an

essential requirement.  Studies have shown that "even moderate copayments for

preventive services" can "deter patients from receiving those services." IOM

REPORT at 19.  In fact, "more than half of women delay or avoid preventative care

because of its costs."  *Priests for Life*, 772 F.3d at 260 (quoting statement of Sen.

Gillbrand, 155 Cong. Rec. 28,843 (2009)).

It is also significant that "[b]efore the ACA, insurance coverage for a female

employee was 'significantly more costly than for a male employee.'"  *Id*. at 262-63

(quoting *Hobby Lobby*, 134 S.Ct. at 2786 (Kennedy, J., concurring).  As a result,

women paid more than men for the same health insurance coverage and, on top of

that, paid an average of sixty-eight percent more than men in out-of-pocket costs.

*Id*. at 263 (citing 155 Cong. Rec. 28,843 (2009) (statement of Sen. Gillibrand)).

Despite its increased costs, historically health insurance has not served women's specific health needs as comprehensively as it has catered to the needs of men.  *Id.* at 258.  Shouldering this burden both physically and economically has thus contributed greatly to gender inequality.  When Congress enacted the Contraceptive Mandate, it specifically sought to end "the punitive practices of the private insurance companies in their gender discrimination."  155 Cong. Rec. 28,842 (daily ed. Dec. 1, 2009).

Indeed, our system of justice has long "recognized the interest in eliminating discrimination against women as sufficiently compelling to justify incursions on rights to expressive association."  *See Priests for Life*, 772 F.3d at 259 (citing *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 625-26 (recognizing the government's compelling interest in creating "rights of public access" to private goods and services in order to promote women's equal enjoyment of leadership skills, business contacts, and employment promotions).  So too, eliminating the past practice of discrimination against women in the provision of health care coverage is sufficiently compelling to justify the broad sweep of the Contraceptive Mandate.[26]

---

[26]  We find support for this holding in *Priests for Life*, 772 F.3d at 259, in which the District Court for the District of Columbia also held that remedying past discrimination against women serves a compelling interest.  The court ultimately concluded that the Contraceptive Mandate survived strict scrutiny under RFRA.  *Id.*

## ii.    Public Health

We next consider those arguments presented by the government which are grounded in concerns for public health.  That same public health interest was the initial impetus for the ACA.  The Departments' stated goal was a sustainable system of taxes and subsidies, established under the ACA, to advance the health of all Americans.  Within that broader goal, the more narrowly tailored Contraceptive Mandate seeks to provide widespread accessibility to contraceptive care, an acknowledged constitutional right. *See Hobby Lobby*, 134 S.Ct. at 2780.  Through independent research, the government determined that women, and also their families, benefit from this widespread accessibility.  Though some women (and men) may not want or use access to contraceptive care, such a widespread goal with such a far-reaching purpose can nonetheless be most efficiently and systematically accomplished through a rule of general applicability, with the individuals themselves making the final determination on whether to use the coverage provided.  It is this interest in widespread care that would be harmed should exemptions to particularized religious claimants be required.

Our conclusion reached today is not the first time a court has determined that the government's interest in ensuring a sustainable system of insurance is compelling.  As the D.C. Circuit has already held, "that interest is as strong as

those asserted in cases . . . recognizing governmental interests in broad

participation in public tax and benefits systems." *Priests for Life*, 772 F.3d at 258.

For example,

> [i]n *Lee*, the Supreme court held that the government's interest in a
> nationwide social security system was sufficiently weighty to require
> that an Amish employer pay unemployment and social security taxes,
> even though the Court acknowledged that doing so would burden the
> Amish employer's religious beliefs. 455 U.S. at 258. The Court
> observed that the social security system "serves the public interest by
> providing a comprehensive insurance system with a variety of
> benefits available to all participants, with costs shared by employers
> and employees." *Id*. The system would not have been viable unless
> broad participation was required, and the Court held that the
> governmental interest "in assuring mandatory and continuous
> participation in and contribution to the social security system"
> sufficed to justify the acknowledged burden on the employer's
> religious exercise. *Id*. at 258-59. So, too, in *Hernandez*, the court
> rejected a claim that denial of certain tax deductions violated the
> plaintiffs' religious exercise because "even a substantial burden [on
> the exercise of religion] would be justified by the broad public
> interest in maintaining a sound tax system." 490 U.S. at 699-700.
> The government concluded that the success of the ACA's effort to
> expand access to health care, improve outcomes, and control costs
> similarly depends on widespread use of preventive care, which the
> Act encourages by requiring that particular preventive measures be
> provided free of cost.

*Priests for Life*, 772 F.3d at 258 (citing 78 Fed. Reg. 39,872 (July 2, 2013)).

Plaintiffs argue that a compelling interest cannot be served where the people

the government means to benefit do not want and will not use the services that the

government seeks to provide. Specifically, Plaintiffs argue that the government's

interest cannot be compelling where its desire to provide women with access to contraceptive care is only furthered when women who want it and will use such items are provided with such coverage.  Contrastingly, where a segment of the population will not use such coverage, Plaintiffs assert that the government's interest cannot be compelling.  We disagree with this assertion.  Time and again, courts have found a government interest to be compelling even when it does not achieve a benefit for each and every member of the population.  Not every person who pays into social security receives or desires its benefits.  Not every person who pays taxes receives unemployment benefits, welfare, or a myriad of other services offered by the government through citizens' tax money.  Plaintiffs' argument is as illogical as it is baseless.  We concur with the government that the coverage provided is so important that comprehensive access to health care serves a compelling government interest.  A ruling that only women, or only individuals without religious objections to certain coverage in their insurance plans, should receive such coverage would cause grave institutional inefficiency.  Contraceptive care is one service that garners religious objection, but as noted above, many other religious objections to additional healthcare procedures and services exist too.  An allowance for each religious objection would render the system, in which the government has an undeniable compelling interest, unworkable.

### d. The Contraceptive Mandate is the Least Restrictive Means of Implementing a Compelling Government Interest

In an argument similar to that made against the government's compelling interest, Plaintiffs argue that the Contraceptive Mandate cannot be the least restrictive means of implementing the government's compelling interest. They point to the vast scheme of exemptions and accommodations to the Mandate, and suggest that the exemptions indicate that a less restrictive means could be available. However, the Plaintiffs do not specifically articulate how these exemptions could be applied to individualized plans of health insurance, and indeed we find that they cannot.

The exemptions to which Plaintiffs point apply only to employers who would supply healthcare coverage to their employees. *See generally, Hobby Lobby*, 134 S.Ct. 2751 (discussing the accommodations to the Contraceptive Mandate afforded due to the unique position that employers are placed in as providers of insurance coverage). Notably, those exemptions do not apply to the employees as individuals. As discussed above, no individual seeking healthcare coverage in the open market receives an exemption from the Contraceptive Mandate. Plaintiffs' argument that the exemptions indicate that the Contraceptive Mandate is not the least restrictive means of implementing the government's

compelling interest due to these exemptions is therefore misplaced, and must fail.

Plaintiffs offer no alternative means for implementing a less restrictive scheme,

and no other rationale for why the Contraceptive Mandate does not meet the least

restrictive means requirement of RFRA.

Alternatively, there are compelling reasons supporting a universal mandate

instituting contraceptive coverage for every health plan purchased by an individual.

This means is not only least restrictive, but preferable.  Several of these arguments

have been discussed above in the context of efficiency.  We also wish to address an

issue of great sensitivity in this regard.  Often, as is the case with Plaintiffs today,

entire families are covered by one plan.  Health care coverage decisions therefore

are not left wholly to the individual but are often made in the context of the family.

Yet there is no guarantee that every member of a family covered by a plan feels

similarly regarding contraceptive services.  If families with religious objections to

contraceptive coverage are able to opt out of such coverage, the determination of

whether to do so is left to the collective family unit.  This collective decision could

create untold tension and familial strife should disagreement over contraceptive

coverage arise, which is more likely now that children up to the age of twenty-six

may be covered by their parents' plans.  Rather than rework health insurance as it

exists in America to create solely individual coverage in the place of plans that

pertain to whole families, it is more workable that each family be required to maintain contraceptive coverage. Thus, each individual member of that family may determine, on their own merit or with the assistance of a physician, whether to utilize that coverage.

That the government should desire for a comprehensive system by which all individuals may make the choice at any time in their lives to accept or reject contraceptive care is an additional reason for why a broadly reaching Contraceptive Mandate is compelling. To allow individuals to elect health insurance coverage that does not provide for these services would be to limit their choice to a one-time decision made at the time that coverage is selected. To change one's mind and alter the coverage, an individual would need to reach out to his or her insurance provider and engage in possibly lengthy administrative communications. Certainly it is possible, and indeed likely, that individuals with religious objections to contraceptive coverage would maintain those objections throughout their lifetimes. Yet situations in which an individual may choose to use contraceptive care, particularly emergency contraceptive care, often arise suddenly and without forewarning. To require adjustments in coverage before obtaining the necessary health care could very well cause a delay in time such that the desired care is no longer advisable or effective, thereby substantially burdening the

individual who seeks it.  Given these concerns, that the government would choose

to institute contraceptive coverage uniformly is a reasonable determination when

implementing its compelling interest in promoting public health.

### e.        Conclusions Pursuant to Plaintiffs' RFRA Claim

For all the reasons discussed above, Plaintiffs RFRA claim fails.  Even if we

presume that Plaintiffs have standing to bring the claim, they have not alleged a

substantial burden to their exercise of religion.  Even if such a burden were found,

the government has articulated a compelling interest in a broadly applicable system

of health care, in order to advance public health and gender equality.  Plaintiffs

have proposed no less restrictive means to administer that system.  Even if a less

restrictive means existed, it would substantially hamper the government's ability to

most effectively achieve the compelling interests discussed above.

## V.    CONCLUSION

For the reasons set forth, we shall deny Plaintiffs' Motion for Summary

Judgment.  We hereby grant Defendants' Motion in full.  A separate order will

issue.